J. SCOTT GERIEN, State Bar No. 184728
MEGAN FERRIGAN HEALY, State Bar No. 229177
DICKENSON, PEATMAN & FOGARTY
809 Coombs Street
Napa, California 94559
Telephone: (707) 252-7122
Facsimile: (707) 255-6876

Attorneys for Plaintiff
WINE SCOUT INTERNATIONAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Wine Scout International<br><br>Plaintiff,<br><br>vs.<br><br>Garcia Family Vineyards, Inc.<br><br>Defendant. | CASE NO. CV 08-00858 JF<br><br>DECLARATION OF J. SCOTT GERIEN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |

I, J. Scott Gerien, declare as follows:

1.      I am counsel of record for Plaintiff, Wine Scout International, doing business as Bounty Hunter ("Wine Scout").  I submit this declaration in support of Wine Scout's Motion for Preliminary Injunction.  I have personal knowledge of the facts stated herein and if called to testify upon same could and would do so willingly.

2.      On January 25, 2000, Wine Scout was issued U.S. Registration No. 2,311,360 for the mark BOUNTY HUNTER for "retail and mail order catalog services featuring wines, speciality [sic] and gourmet foods, cigars and wine related accessories" based on an application

filed on November 12, 1998, with a first use date of December 10, 1994. Attached hereto as Exhibit 1 is a true and correct copy of Wine Scout's Certificate of Registration for the mark BOUNTY HUNTER evidencing the first use date of the mark, the application filing date and the registration date. Such registration became incontestable by virtue of Wine Scout's filing of a Combined Declaration of Use and Incontestability under Trademark Act §§ 8 and 15 on January 5, 2006. A copy of the USPTO Trademark Applications and Registrations Retrieval (TARR) database demonstrating the current active status of this registration is attached hereto as Exhibit 2.

3.     Defendant Garcia Family Vineyards, Inc., d/b/a Bounty Hunter Wines ("Garcia"), is a California corporation that has demonstrated an intent to sell wine from the California appellation under the mark BOUNTY HUNTER. Attached hereto as Exhibit 3 is a true and correct copy of a Certificate of Label Approval (COLA) issued by the U.S. Alcohol Tobacco Tax and Trade Bureau (TTB) on October 3, 2007, evidencing a label approval for the label for the wine brand BOUNTY HUNTER produced by Pisoni Vineyards & Winery, Sons of Bacchus, LLC, d/b/a Garcia Family Vineyards. The term "California" on the front of the wine label and in the application box marked "Wine Appellation" indicates that the BOUNTY HUNTER wine to be sold by Garcia is produced from California grapes.

4.     On October 26, 2007, I learned of the issuance of the BOUNTY HUNTER COLA to Garcia and alerted Wine Scout. On October 29, 2007, the next business day, Wine Scout sent a demand letter to Pisoni Vineyards putting it on notice of Wine Scout's trademark rights in the mark BOUNTY HUNTER and requesting that it not produce any wine labeled with the mark BOUNTY HUNTER. Attached hereto as Exhibit 4 is a true and correct copy of Wine Scout's October 29, 2007, letter to Pisoni Vineyards.

5.     On November 1, 2007, attorneys for Pisoni Vineyards contacted our office via letter and advised us that Defendant, Garcia Family Vineyards, had contracted with Pisoni Vineyards to produce the BOUNTY HUNTER wine on Garcia's behalf under a custom crush and

J. SCOTT GERIEN DECLARATION          2
CASE NO. CV 08-00858 JF

bottling arrangement and that the BOUNTY HUNTER COLA had been obtained by Pisoni Vineyards on behalf of Garcia. Attached hereto as Exhibit 5 is a true and correct copy of Pisoni Vineyards' November 1, 2007, letter to Wine Scout.

6.    On November 2, 2007, Wine Scout sent a demand letter to Garcia demanding that it not initiate use of the BOUNTY HUNTER mark on wine. Attached hereto as Exhibit 6 is a true and correct copy of Wine Scout's November 2, 2007, letter to Garcia.

7.    On November 2, 2007, Garcia responded with a letter indicating that it intended to continue with its plans to develop its winery and produce a BOUNTY HUNTER brand wine and would not comply with Wine Scout's demand not to use the BOUNTY HUNTER mark on wine. Attached hereto as Exhibit 7 is a true and correct copy of Garcia's November 2, 2007, letter to Wine Scout.

8.    On November 9, 2007, we filed a trademark application on behalf of Wine Scout for the mark BOUNTY HUNTER for wine (U.S. Application Serial No. 77/326413) in order to better protect Wine Scout's common law rights in the mark for wine.    A printout from the USPTO's TARR database showing the current active status of this application is attached as Exhibit 8. On February 21, 2008, we received an Office Action from the USPTO indicating that the BOUNTY HUNTER application would conflict with Plaintiff's existing registration for BOUNTY HUNTER for retail and mail order services featuring wines (U.S. Registration No. 2,311,360) and that Wine Scout needed to claim ownership in the prior registration, and if it could not, the application would be refused, as indicated by the cite to TMEP § 812. A true and correct copy of this Office Action is attached as Exhibit 9. As Wine Scout was the owner of both the BOUNTY HUNTER application and the BOUNTY HUNTER registration, we submitted a claim of ownership on behalf of Wine Scout and the BOUNTY HUNTER application has been approved for publication by the USPTO. *See* Exhibit 8.

9.    We continued to monitor Garcia's activities and on February 5, 2008, learned that Garcia had submitted an application to the California Department of Alcoholic Beverage Control for a Type-02 Winegrower License under the d/b/a "Bounty Hunter Wines." The license application was submitted on January 10, 2008. Attached hereto as Exhibit 10 is a true and correct copy of Garcia's license information printed from the "License Query System" database available at the California Department of Alcoholic Beverage Control's website, www.abc.ca.gov. A review of the Internet also revealed that Garcia has an operable website at the domain name www.bountyhunterwinery.com advertising its BOUNTY HUNTER brand with a copyright notice dated 2008. Attached hereto as Exhibit 11 is a true and correct copy of a printout from the home page of Garcia's Internet web site, www.bountyhunterwinery.

10.    Garcia's proceeding with applying for its Type-02 Winegrower License under the d/b/a Bounty Hunter Wines and its operation of a www.bountyhunterwinery.com Internet website promoting its BOUNTY HUNTER brand indicated to Wine Scout that Garcia intended to continue with its planned use of the mark BOUNTY HUNTER on wine, so Wine Scout instructed us to proceed with preparing and filing a complaint against Garcia. The complaint in this proceeding was filed with the Court on February 8, 2008.

11.    On or about February 15, 2008, after representatives for the parties spoke via telephone and Garcia stated to Plaintiff that it would not cease its planned introduction of a BOUNTY HUNTER brand wine absent a monetary payment from Wine Scout, Wine Scout instructed us to proceed with securing the first available hearing date and file this motion.

12.    Attached hereto as Exhibit 12 is a true and correct copy of a study from the University of California Agricultural Issues Center entitled "What Determines the Price of Wine?" demonstrating the low price point of wines from the California appellation.

13.    Attached hereto as Exhibit 13 is a true and correct copy of an article from the website of *Wine Business* magazine, www.winebusiness.com, entitled "The 2004 American Wine Writer Survey," discussing the influence that wine writers have on the success of a wine brand.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 14th day of March, 2008, at Napa, California.

J. SCOTT GERIEN

**EXHIBIT 1**

Int. Cl.: 35

Prior U.S. Cls.: 100, 101 and 102

**United States Patent and Trademark Office**

Reg. No. 2,311,360

Registered Jan. 25, 2000

## SERVICE MARK
### PRINCIPAL REGISTER

## BOUNTY HUNTER

WINE SCOUT INTERNATIONAL (CALIFOR-
NIA CORPORATION)
101 SOUTH COOMBS STREET, #5
NAPA, CA 94559

FOR: RETAIL STORE AND MAIL ORDER
CATALOG SERVICES FEATURING WINES,
SPECIALITY AND GOURMET FOODS,

CIGARS AND WINE RELATED ACCESSORIES
, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).
FIRST USE 12-10-1994; IN COMMERCE
12-10-1994.

SER. NO. 75-587,749, FILED 11-12-1998.

DOUGLAS LEE, EXAMINING ATTORNEY

# EXHIBIT 2

**Thank you for your request. Here are the latest results from the TARR web server.**

**This page was generated by the TARR system on** 2008-03-04 12:54:04 ET

**Serial Number:** 75587749 Assignment Information        Trademark Document Retrieval

**Registration Number:** 2311360

**Mark (words only):** BOUNTY HUNTER

**Standard Character claim:** No

**Current Status:** Section 8 and 15 affidavits have been accepted and acknowledged.

**Date of Status:** 2006-04-24

**Filing Date:** 1998-11-12

**Transformed into a National Application:** No

**Registration Date:** 2000-01-25

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 108

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at TrademarkAssistanceCenter@uspto.gov**

**Current Location:** 40S -Scanning On Demand

**Date In Location:** 2006-05-24

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Wine Scout International

**Address:**
Wine Scout International
975 1ST ST.
Napa, CA 94559
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** California

---

## GOODS AND/OR SERVICES

**International Class:** 035
**Class Status:** Active
RETAIL STORE AND MAIL ORDER CATALOG SERVICES FEATURING WINES, SPECIALITY AND GOURMET FOODS, CIGARS AND WINE RELATED ACCESSORIES
**Basis:** 1(a)
**First Use Date:** 1994-12-10

**First Use in Commerce Date:** 1994-12-10

---

## ADDITIONAL INFORMATION

---

(NOT AVAILABLE)

---

## MADRID PROTOCOL INFORMATION

---

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

---

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2006-06-28 - TEAS Change Of Correspondence Received

2006-05-24 - Case File In TICRS

2006-04-24 - Section 8 (6-year) accepted & Section 15 acknowledged

2006-01-05 - Section 8 (6-year) and Section 15 Filed

2006-01-11 - TEAS Change Of Correspondence Received

2006-01-05 - TEAS Section 8 & 15 Received

2000-01-25 - Registered - Principal Register

1999-11-02 - Published for opposition

1999-10-01 - Notice of publication

1999-06-15 - Approved for Pub - Principal Register (Initial exam)

1999-06-14 - Assigned To Examiner

---

## ATTORNEY/CORRESPONDENT INFORMATION

---

**Attorney of Record**
Melville Owen

**Correspondent**
J. Scott Gerien
Dickenson, Peatman & Fogarty
809 Coombs Street
Napa CA 94559
Phone Number: 707-252-7122
Fax Number: 707-255-6876

---

# EXHIBIT 3

TTB ID  07268-000-000071

**DEPARTMENT OF THE TREASURY**
ALCOHOL AND TOBACCO TAX AND TRADE BUREAU
**APPLICATION FOR AND CERTIFICATION/EXEMPTION OF LABEL/BOTTLE APPROVAL**
(See Instructions and Paperwork Reduction Act Notice Below)

**PART I - APPLICATION**

| | |
|---|---|
| 1. REP. ID. NO. (If any)   1 2-8 | CT 80   OR 01 |

2. PLANT REGISTRY/BASIC PERMIT/BREWER'S NO. (Required)

BW-CA-6461

3. SOURCE OF PRODUCT (Required)
☒ Domestic    ☐ Imported

8. NAME AND ADDRESS OF APPLICANT AS SHOWN ON PLANT REGISTRY, BASIC PERMIT, OR BREWER'S NOTICE. INCLUDE APPROVED DBA OR TRADENAME IF USED ON THE LABEL (Required)

PISONI VINEYARDS & WINERY, SONS OF BACCHUS, LLC
dba GARCIA FAMILY VINEYARDS
3354-A COFFEY LANE
SANTA ROSA, CA 95403-0000

4. SERIAL NUMBER (Required)

| YEAR | | | | | |
|---|---|---|---|---|---|
| 0 | 7 | - | 0 | 0 | 1 | 3 |

5. TYPE OF PRODUCT (Required)
☒ WINE
☐ DISTILLED SPIRITS
☐ MALT BEVERAGES

8a. MAILING ADDRESS, IF DIFFERENT

6. BRAND NAME (Required)
BOUNTY HUNTER

7. FANCIFUL NAME (If any)

9. EMAIL ADDRESS
LABELS@bwsinc.biz

10. FORMULA/SOP NO. (If any)

11. LAB. NO. & DATE/PRE-IMPORT NO. & DATE (If any)

18. TYPE OF APPLICATION (Check applicable box(es))
a. ☒ CERTIFICATE OF LABEL APPROVAL
b. ☐ CERTIFICATE OF EXEMPTION FROM LABEL APPROVAL
   "For sale in _____ only" (Fill in State abbreviation)
c. ☐ DISTINCTIVE LIQUOR BOTTLE APPROVAL. TOTAL BOTTLE CAPACITY BEFORE CLOSURE _____ (Fill in amount)
d. ☐ RESUBMISSION AFTER REJECTION
   TTB ID _____

12. NET CONTENTS
750ml

13. ALCOHOL CONTENT
14.0%

14. WINE APPELLATION (If on label)
CALIFORNIA

15. WINE VINTAGE DATE (If on label)
2006

16. PHONE NUMBER
(800)788-0212

17. FAX NUMBER
(800)954-9463

19. SHOW ANY WORDING (a) APPEARING ON MATERIALS FIRMLY AFFIXED TO THE CONTAINER (e.g., caps, celoseals, corks, etc.) OTHER THAN THE LABELS AFFIXED BELOW, OR (b) BLOWN BRANDED OR EMBOSSED ON THE CONTAINER (e.g. net contents etc.). THIS WORDING MUST BE NOTED HERE EVEN IF IT DUPLICATES PORTIONS OF THE LABELS AFFIXED BELOW. ALSO, PROVIDE TRANSLATIONS OF FOREIGN LANGUAGE TEXT APPEARING ON LABELS.

TO COVER NET CONTENTS OF 375 ML TO 3 L

**PART II - APPLICANT'S CERTIFICATION**

Under the penalties of perjury, I declare: that all statements appearing on this application are true and correct to the best of my knowledge and belief; and, that the representations on the labels attached to this form, including supplemental documents, truly and correctly represent the content of the containers to which these labels will be applied. I also certify that I have read, understood and complied with the conditions and instructions which are attached to an original TTB F 5100.31, Certificate/Exemption of Label/Bottle Approval.

20. DATE OF APPLICATION
09/24/07

21. SIGNATURE OF APPLICANT OR AUTHORIZED AGENT

22. PRINT NAME OF APPLICANT OR AUTHORIZED AGENT
ANDREA L ANDERSON, ATTORNEY-IN-FACT

**PART III - TTB CERTIFICATE**

This certificate is issued subject to applicable laws, regulations and conditions as set forth in the instructions portion of this form.

23. DATE ISSUED
OCT - 3 2007

24. AUTHORIZED SIGNATURE, ALCOHOL AND TOBACCO TAX AND TRADE BUREAU

**FOR TTB USE ONLY**

QUALIFICATIONS

35. WHEN NEW LABELS ARE PRINTED,
_Consumption_ delete hyphen
MUST BE SPELLED CORRECTLY IN THE GOVERNMENT WARNING STATEMENT.

EXPIRATION DATE (If any)

AF... (instructions 4, 6 and 7)



FRONT

Vintage
2006
**BOUNTY HUNTER**
★
California
CABERNET SAUVIGNON
alc. 14% by vol.



BACK

Back in the 1800's ...

The BOUNTY HUNTER would seek the outlaw fleeing from the law. When the Bounty Hunter came to the door of the guarantor of the bail, he would seize the most precious assets to cover the bail. THE FINEST CASKS OF WINE!

This was more valuable than gold, silver or jewels. Being paid off and satisfied in his drunkenness, he would consider the debt paid-in-full.

Today, we bring you a fine wine worthy of paying even the most Notorious Outlaws' bail. ENJOY!!
You are the BOUNTY HUNTER...

bounty hunter; one who tracks down and captures outlaws for whom a reward is offered
BountyHunterWinery.com
★
CELLARED AND BOTTLED BY
GARCIA FAMILY VINEYARDS, SANTA ROSA, CA

GOVERNMENT WARNING: (1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS.
CONTAINS SULFITES                                    750ML

TTB F 5100.31 (6/2006)    PREVIOUS EDITIONS ARE OBSOLETE

**EXHIBIT 4**



DICKENSON, PEATMAN & FOGARTY
*A Professional Law Corporation*

J. SCOTT GERIEN
sgerien@dpf-law.com

October 29, 2007

809 Coombs Street
Napa, CA 94559-2977
Tel: 707 252 7122
Fax: 707 255 6876

www.dpf-law.com

**VIA U.S. MAIL AND FACSIMILE 831-675-2557**

Mr. Mark Pisoni
Pisoni Vineyards & Winery,
Sons of Bacchus, LLC
dba Garcia Family Wines
3354-A Coffey Lane
Santa Rosa, CA  95403

Re:    Infringement of BOUNTY HUNTER Mark

Dear Mr. Pisoni:

We are intellectual property counsel to Wine Scout International, doing business as Bounty Hunter ("Bounty Hunter"). Bounty Hunter is the owner of the incontestable federal trademark registration for the mark BOUNTY HUNTER for catalog and retail store services for wine (U.S. Reg. No. 2,311,360). Our client's BOUNTY HUNTER retail store, Internet and mail order wine services are well-known and have been featured in numerous publications including *Wine Spectator, San Francisco Chronicle, Wall Street Journal, Money, 7x7, Playboy, Sunset, Wine & Spirits, Food & Wine* and *The Press Democrat*, as well as on NBC's Today Show. Bounty Hunter also produces its own wines, a fact which was featured in the most recent *Wine Spectator*.

It recently came to our attention that your company obtained a Certificate of Label Approval (COLA) on October 3, 2007 for a BOUNTY HUNTER brand of wine. Obviously, this mark is identical to our client's BOUNTY HUNTER mark and the label uses the same type of Old West imagery which our client utilizes with its catalog, Internet and retail store services. It is well-settled that the use of the identical mark on goods and retail services offering those goods will likely result in consumer confusion. Thus, your use of the mark BOUNTY HUNTER on wine is an infringement of our client's rights in violation of the federal Lanham Act and California unfair competition laws.

Accordingly, on behalf of our client, we must demand that Garcia Family Wines and Pisoni Vineyards & Winery, Sons of Bacchus, LLC, not label, ship, sell, advertise or promote any wine under the mark BOUNTY HUNTER. To the extent that Pisoni is only acting as custom crush facility or bottler for the wine, and otherwise was unaware of our client's trademark rights, our client will not seek liability against Pisoni provided it

NAPA & SANTA ROSA

Mr. Mark Pisoni
October 29, 2007
Page 2

complies with the preceding demand and immediately provides us with full and complete contact information for Garcia Family Wines.

We expect your response by Friday, November 2, 2007. If you fail to comply with the above demands, our client will act to fully enforce its valuable trademark rights. This letter is written without prejudice to Bounty Hunter's rights, all of which are expressly reserved.

Sincerely,

DICKENSON, PEATMAN & FOGARTY

J. Scott Gerien

JSG:jk
cc:    Wine Scout International

**EXHIBIT 5**

NOLAND
HAMERLY
ETIENNE
HOSS

WWW.NHEH.COM
E-MAIL TBALDWIN@NHEH.COM
831-424-1414 EXT. 259
OUR FILE NO. 16962

_Attorneys at Law_ | A PROFESSIONAL CORPORATION

Harry L. Noland
(1904-1991)

Paul M. Hamerly
(1920-2000)

Myron E. Etienne, Jr.

James D. Schwefel, Jr.

Stephen W. Pearson

Lloyd W. Lowrey, Jr.

Anne Secker

Randy Meyenberg

Michael Masuda

Christine Gianascol Kemp

Jo Marie Ometer

Terrence R. O'Connor

Kirk R. Wagner

Dale E. Grindrod

Lisa K. Omori

Leslie E. Finnegan

Timothy J. Baldwin

Stacy S. Camiel

Renée Conrad de Torres

Daniel E. Griffee

Charles Des Roches

Of Counsel

Peter T. Hoss

Martin J. May

Blanca E. Zarazúa

November 1, 2007

**VIA FACSIMILE - 707-255-6876 AND UNITED STATES MAIL**

J. Scott Gerien, Esq.
Dickenson, Peatman & Fogarty
809 Coombs Street
Napa CA 94559-2977

Re:   BOUNTY HUNTER TRADEMARK

Dear Mr. Gerien:

This office represents Sons of Bacchus, LLC, a California limited liability company doing business as Pisoni Vineyards and Winery ("Sons of Bacchus").

Sons of Bacchus forwarded to my attention your letter dated October 29, 2007 regarding Garcia Family Wines and the BOUNTY HUNTER trademark held by Wine Scout International. My client's relationship with Garcia Family Wines is limited to providing custom crushing and bottling services. Please contact Mr. Mark Garcia directly at 5672 Eleanor Avenue, Oakdale, California 95361 regarding this matter.

If you have any questions or need to discuss this matter further, please feel free to give me a call. Otherwise we will await instruction from Mr. Garcia regarding the label under which he will be bottling wine.

Yours truly,

NOLAND, HAMERLY, ETIENNE & HOSS.
A Professional Corporation

Timothy J. Baldwin

TJB:cwc

cc:   Client
      Mr. Mark Garcia

# EXHIBIT 6



DICKENSON, PEATMAN & FOGARTY
*A Professional Law Corporation*

J. SCOTT GERIEN
sgerien@dpf-law.com

809 Coombs Street
Napa, CA 94559-2977
Tel: 707 252 7122
Fax: 707 255 6876

www.dpf-law.com

November 2, 2007

**VIA EXPRESS MAIL – SATURDAY DELIVERY**           EV 9042330222US

Mr. Mark Garcia
Garcia Family Wines
5672 Eleanor Avenue
Oakdale, California 95361

Re:    **Infringement of BOUNTY HUNTER Mark**

Dear Mr. Garcia:

We are intellectual property counsel to Wine Scout International, doing business as Bounty Hunter ("Bounty Hunter"). Bounty Hunter is the owner of the incontestable federal trademark registration for the mark BOUNTY HUNTER for catalog and retail store services for wine (U.S. Reg. No. 2,311,360). Our client's BOUNTY HUNTER retail store, Internet and mail order wine services are well-known and have been featured in numerous publications including *Wine Spectator, San Francisco Chronicle, Wall Street Journal, Money, 7x7, Playboy, Sunset, Wine & Spirits, Food & Wine* and *The Press Democrat*, as well as on NBC's Today Show. Bounty Hunter also produces its own wines, a fact which was featured in the most recent *Wine Spectator*. Needless to say, the BOUNTY HUNTER mark is very valuable to our client and it vigilantly monitors its rights therein.

It recently came to our attention that a Certificate of Label Approval ("COLA") for a BOUNTY HUNTER brand of wine was obtained for Garcia Family Wines on October 3, 2007, by Sons of Bacchus, LLC, under a custom crushing and bottling arrangement. Obviously, this mark is identical to our client's BOUNTY HUNTER mark and the label uses the same type of Old West imagery which our client utilizes with its catalog, Internet and retail store services. It is well-settled that the use of the identical mark on goods and retail services offering those goods will likely result in consumer confusion. Thus, your use of the mark BOUNTY HUNTER on wine is an infringement of our client's rights in violation of the federal Lanham Act and California unfair competition laws.

Accordingly, on behalf of our client, we hereby demand that Garcia Family Wines immediately cease all use of the mark BOUNTY HUNTER for wine or related goods and services. This includes cessation of all use of the internet domain name www.bountyhunterwine.com, as well as providing us with a written statement that Garcia

NAPA & SANTA ROSA

Mr. Mark Garcia
November 2, 2007
Page 2

Family Wines will never in the future produce, label, ship, sell, advertise or promote any wine under the mark BOUNTY HUNTER, or any confusingly similar mark.

We expect your response to these requests no later than **Tuesday, November 6, 2007**. If you provide us with the requested assurances, we believe this matter may be resolved. However, please be advised that if you fail to comply with the above demands, our client will act to fully enforce its valuable trademark rights, including seeking attorneys' fees and damages, should we be unable to resolve this matter amicably.

This letter is written without prejudice to Bounty Hunter's rights, all of which are expressly reserved.

Sincerely,

DICKENSON, PEATMAN & FOGARTY

J. Scott Gerien

JSG: mfh
cc:    Wine Scout International

# EXHIBIT 7

# jv law

THE PROPERTY LAW PROFESSIONALS™
REAL ■ INTELLECTUAL ■ BUSINESS

November 2, 2007 · *Via Facsimile (707) 255-6876*
*& U.S. Mail*

J. Scott Gerien, Esq.
DICKENSON, PEATMAN & FOGARTY, P.C.
809 Coombs Street
Napa, CA 94559

Re:   Alleged Infringement of <u>Bounty Hunter</u> Mark

Dear Mr. Gerien:

This firm represents Mark and Angela Garcia and Garcia Family Wines in the above-referenced matter. Please direct all future communications to my office.

My clients, Mark and Angela Garcia, are the owners of Garcia Bail Bonds, which services the entire state of California (www.BailBondGirl.com). The Garcia family has been involved in the bail bond industry for over 12 years, and has built up goodwill and consumer recognition in the industry throughout the state (Mrs. Garcia is "Bail Bond Girl," the recipient of a federal decree of secondary meaning).

The Garcia family owns vineyards and is establishing a winery. Due to their primary occupation as "bounty hunters," my clients wanted to create a wine brand that capitalized on the goodwill already associated with the Garcia family name in the bail bonds and legal industry. Simply put, the *Bounty Hunter* moniker meshed their two passions in life: their occupation and their wine.

My clients were not aware of your client's retail store or catalog services at the time of inception of this idea. Further, my clients retained an independent design firm to develop the wine labels, and any similarities in imagery were unintentional. Since the heyday of bounty hunters and their ilk was the Old West (e.g., Steve McQueen in *Wanted: Dead or Alive*), it is natural that the parties would both use Old West themes and imagery. They had no intent or desire to affect Mr. Pope's business or clientele.

As to your client's federal trademark registration, it is a registration for Class 35, and the description is for "Retail Store and Mail Order Catalog Services Featuring Wines, Specialty and Gourmet Foods, Cigars, and Wine Related Accessories." Although your client may produce its own wine, your client does not have a federal trademark for a wine label using the *Bounty Hunter* name. After browsing your client's website, I could not find any wine being sold that used the *Bounty Hunter* name.

My clients extensively researched the existing wines, and finding no wines using the brand name *Bounty Hunter*, they felt free to utilize the name that correlates with their primary occupations. Consequently, the TTB approved the *Bounty Hunter* label because it was available and unused.

Page 2
Re: *Bounty Hunter* Mark
<u>November 2, 2007</u>

In addition, as you are well aware, my client's winery and wine label belong to entirely different international trademark classes. Thus, your client's *Bounty Hunter* mark is inapplicable to my clients' pursuits. Given that your client runs a retail store and catalog business, our clients are not competitors and the public will not be confused by the name.

My clients intend to continue to cultivate their vineyards, develop their winery, and produce wine for wholesale purposes.

However, my clients have no ill intent towards Wine Scout, and are open to a dialogue with Mr. Pope regarding efforts to distinguish the marks. Although my clients have been successful at federal trademark infringement litigation in the past, they would to resolve this matter amicably if possible.

Thank you for your anticipated cooperation.

Respectfully,

JV LAW

John W. Villines
john@jvlaw.net

JWV/mm

cc:    Garcia Family Vineyards

# EXHIBIT 8

**Thank you for your request. Here are the latest results from the <u>TARR web server.</u>**

**This page was generated by the TARR system on** 2008-03-04 13:38:59 ET

**Serial Number:** 77326413 <u>Assignment Information</u>    <u>Trademark Document Retrieval</u>

**Registration Number:** (NOT AVAILABLE)

**Mark**

# BOUNTY HUNTER

**(words only):** BOUNTY HUNTER

**Standard Character claim:** Yes

**Current Status:** Approved by the examining attorney for publication for opposition. This is NOT the beginning of the Opposition period. In approximately two months, please visit the web site to learn the actual date of publication for opposition in the Trademark Official Gazette.

**Date of Status:** 2008-03-01

**Filing Date:** 2007-11-09

**Transformed into a National Application:** No

**Registration Date:** (DATE NOT AVAILABLE)

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 110

**Attorney Assigned:**
CROWLEY PAUL C

**Current Location:** M1X -TMO Law Office 110 - Examining Attorney Assigned

**Date In Location:** 2008-03-01

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Wine Scout International

**Address:**
Wine Scout International
975 First Street
Napa, CA 94559
United States

**Legal Entity Type:** Corporation
**State or Country of Incorporation:** California

---

## GOODS AND/OR SERVICES

---

**International Class:** 033
**Class Status:** Active
Wine
**Basis:** 1(a)
**First Use Date:** 1999-08-31
**First Use in Commerce Date:** 1999-08-31

---

## ADDITIONAL INFORMATION

---

**Prior Registration Number(s):**
2311360

---

## MADRID PROTOCOL INFORMATION

---

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

---

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2008-03-01 - Approved for Pub - Principal Register (Initial exam)

2008-02-21 - Teas/Email Correspondence Entered

2008-02-21 - Communication received from applicant

2008-02-21 - TEAS Response to Office Action Received

2008-02-21 - Notification Of Priority Action E-Mailed

2008-02-21 - Priority Action E-Mailed

2008-02-21 - Priority Action Written

2008-02-13 - Assigned To Examiner

2008-02-05 - TEAS Amendment Entered Before Attorney Assigned

2008-02-05 - TEAS Preliminary Amendment Received

2007-11-15 - New Application Entered In Tram

---

## ATTORNEY/CORRESPONDENT INFORMATION

---

**Attorney of Record**
J. Scott Gerien

**Correspondent**
J. SCOTT GERIEN
DICKENSON, PEATMAN & FOGARTY
809 COOMBS ST
NAPA, CA 94559-2937
Phone Number: 707-252-7122
Fax Number: 707-255-6876

# EXHIBIT 9

| To: | Wine Scout International (tmdept@dpf-law.com) |
| --- | --- |
| Subject: | TRADEMARK APPLICATION NO. 77326413 - BOUNTY HUNTER - N/A |
| Sent: | 2/21/2008 8:28:12 AM |
| Sent As: | ECOM110@USPTO.GOV |
| Attachments: | Attachment - 1 |
| | Attachment - 2 |

## UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO:**    77/326413

**MARK:** BOUNTY HUNTER

**CORRESPONDENT ADDRESS:**
    J. SCOTT GERIEN
    DICKENSON, PEATMAN & FOGARTY
    809 COOMBS ST
    NAPA, CA 94559-2937

# *77326413*

**RESPOND TO THIS ACTION:**
http://www.uspto.gov/teas/eTEASpageD.htm

**GENERAL TRADEMARK INFORMATION:**
http://www.uspto.gov/main/trademarks.htm

**APPLICANT:**    Wine Scout International

**CORRESPONDENT'S REFERENCE/DOCKET NO:**
    N/A
**CORRESPONDENT E-MAIL ADDRESS:**
    tmdept@dpf-law.com

## PRIORITY ACTION

TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE ISSUE/MAILING DATE.

**ISSUE/MAILING DATE: 2/21/2008**

**OFFICE SEARCH:** The examining attorney has searched the Office records and has found no similar registered or pending mark which would bar registration under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d). TMEP section 704.02.

The following issues were addressed with J. Scott Gerien, Esq., in communications on February 20, 2008.

**Requirement**

**Ownership of Prior Registration**

If applicant is the owner of U.S. Registration No. 2311360, then applicant must submit a claim of ownership. 37 C.F.R. §2.36; TMEP §812. The following standard format is suggested:

Applicant is the owner of U.S. Registration No. 2311360.


Paul C. Crowley

/Paul C. Crowley/

Trademark Attorney

Law Office 110

(571) 272-8846

Fax (formal responses only) (571) 273-9110


**RESPOND TO THIS ACTION:** If there are any questions about the Office action, please contact the assigned examining attorney. A response to this Office action should be filed using the form available at http://www.uspto.gov/teas/eTEASpageD.htm. If notification of this Office action was received via e-mail, no response using this form may be filed for 72 hours after receipt of the notification. **Do not attempt to respond by e-mail as the USPTO does not accept e-mailed responses.**

If responding by paper mail, please include the following information: the application serial number, the mark, the filing date and the name, title/position, telephone number and e-mail address of the person signing the response. Please use the following address: Commissioner for Trademarks, P.O. Box 1451, Alexandria, VA 22313-1451.

**STATUS CHECK:** Check the status of the application at least once every six months from the initial filing date using the USPTO Trademark Applications and Registrations Retrieval (TARR) online system at http://tarr.uspto.gov. When conducting an online status check, print and maintain a copy of the complete TARR screen. If the status of your application has not changed for more than six months, please contact the assigned examining attorney.

**Print: Feb 21, 2008**                    **75587749**

## DESIGN MARK

**Serial Number**
75587749

**Status**
SECTION 8 & 15-ACCEPTED AND ACKNOWLEDGED

**Word Mark**
BOUNTY HUNTER

**Standard Character Mark**
No

**Registration Number**
2311360

**Date Registered**
2000/01/25

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
Wine Scout International CORPORATION CALIFORNIA 975 1ST ST. Napa
CALIFORNIA 94559

**Goods/Services**
Class Status -- ACTIVE.  IC 035.  US  100 101 102.  G & S: RETAIL
STORE AND MAIL ORDER CATALOG SERVICES FEATURING WINES, SPECIALITY AND
GOURMET FOODS, CIGARS AND WINE RELATED ACCESSORIES.  First Use:
1994/12/10.  First Use In Commerce: 1994/12/10.

**Filing Date**
1998/11/12

**Examining Attorney**
LEE, DOUGLAS

**Attorney of Record**
Melville Owen

# BOUNTY HUNTER

| To: | Wine Scout International (tmdept@dpf-law.com) |
|---|---|
| Subject: | TRADEMARK APPLICATION NO. 77326413 - BOUNTY HUNTER - N/A |
| Sent: | 2/21/2008 8:28:13 AM |
| Sent As: | ECOM110@USPTO.GOV |
| Attachments: | |

# IMPORTANT NOTICE
## USPTO OFFICE ACTION HAS ISSUED ON 2/21/2008 FOR APPLICATION SERIAL NO. 77326413

Please follow the instructions below to continue the prosecution of your application:

**VIEW OFFICE ACTION:** Click on this link **http://tmportal.uspto.gov/external/portal/tow?DDA=Y&serial_number=77326413&doc_type=PAT&mail_date=20080** (or copy and paste this URL into the address field of your browser), or visit **http://tmportal.uspto.gov/external/portal/tow** and enter the application serial number to **access** the Office action.

**PLEASE NOTE**: The Office action may not be immediately available but will be viewable within 24 hours of this notification.

**RESPONSE MAY BE REQUIRED:** You should carefully review the Office action to determine (1) if a response is required; (2) how to respond; and (3) the applicable **response time period**. Your response deadline will be calculated from 2/21/2008.

**Do NOT hit "Reply" to this e-mail notification, or otherwise attempt to e-mail your response, as the USPTO does NOT accept e-mailed responses. Instead, the USPTO recommends that you respond online using the Trademark Electronic Application System response form at http://www.uspto.gov/teas/eTEASpageD.htm.**

**HELP:** For *technical* assistance in accessing the Office action, please e-mail **TDR@uspto.gov**. Please contact the assigned examining attorney with questions about the Office action.

# WARNING
## 1. The USPTO will NOT send a separate e-mail with the Office action attached.

## 2. Failure to file any required response by the applicable deadline will result in the ABANDONMENT of your application.

# EXHIBIT 10



# California Department of Alcoholic Beverage Control
## *License Query System Summary*
## *as of 3/3/2008*

| License Information |
|---|
| **License Number:** 462832      **Status:** PENDING |
| **Primary Owner:** GARCIA FAMILY VINEYARDS INC |
| **ABC Office of Application:** STOCKTON |
| **Business Name** |
| **Doing Business As:** BOUNTY HUNTER WINES |
| **Business Address** |
| **Address:** 5672 ELEANOR AVE     **Census Tract:** |
| **City:** OAKDALE    **County:** STANISLAUS |
| **State:** CA    **Zip Code:** 95361-9326 |
| **Licensee Information** |
| **Licensee:** GARCIA FAMILY VINEYARDS INC |
| *Company Officer Information* |
| **Officer:** GARCIA MARK ANTHONY, PRESIDENT/SECRETARY |
| **Officer:** GARCIA ANGELA MARIE, VICE PRESIDENT/TREASURER |
| **License Types** |
| **1) License Type:** 02 - WINEGROWER |
| **License Type Status:** PENDING |
| **Status Date:** 10-JAN-2008     **Term:** Month(s) |
| **Original Issue Date:**     **Expiration Date:** |
| **Master:** N    **Duplicate:** 0    **Fee Code:** NA |
| **Current Disciplinary Action** |
| *. . No Active Disciplinary Action found . . .* |
| **Disciplinary History** |
| *. . No Disciplinary History found . . .* |
| **Hold Information** |
| **Hold Date:**    **Type:** FORM 220 |
| **Hold Date:** 29-JAN-2008    **Type:** EXCISE TAX HOLD |
| **Escrow** |
| *. . No Escrow found . . .* |

- - - *End of Report* - - -

For a definition of codes, view our <u>glossary.</u>

# EXHIBIT 11

# BOUNTY HUNTER WINERY

GARCIA FAMILY VINEYARDS, INC

*Welcome to the Home of the Bounty Hunter Winery, our site is under construction.*
*In the near future we will feature are wines and vineyard events.*

*Mark and Angela Garcia,*
*Winegrowers*
*Direct Tel. No. 707-623-3495*

Home Page

Page 2

Copyright 2008. Bounty Hunter Winery. All rights reserved.



GoDaddy.com is the world's #1 ICANN-accredited domain name registrar!

# EXHIBIT 12

Case 5:08-cv-00858-JF    Document 12-2    Filed 03/14/2008    Page 34 of 44

University of California

Agricultural Issues Center

Number 18
January
2 0 0 3

# AIC Issues Brief

# What Determines the Price of Wine?

## The Value of Grape Characteristics and Wine Quality Assessments

Helene Bombrun and Daniel A. Sumner[1]

## Introduction

Wine is a highly differentiated product derived from grapes of various varieties grown in different regions under diverse agronomic and climatic conditions, which vary by location and year. The wide range of wine products and prices reflect this heterogeneity. Naturally, the price of wine, as with other goods, will be strongly and positively associated with its quality as perceived by consumers. However, in most cases, the comparison across bottles of wine is made without really knowing the quality in the bottle relative to other wines. Consumers must rely on information other than their own tasting experience. Label information at the point of purchase is the most accessible, and quality assessments in the press supplement that information.

Each bottle of wine sold in the United States must provide such information as brand name, class or type of the wine, alcohol content, net volume content, and the name and address of the bottling firm. Most wineries also provide tightly regulated information regarding grape variety, vintage (harvest year) and appellation of origin. (Details of federal laws on wine labeling are in 27 CFR Part 4, published on the Wine Institute website, www.wineinstitute.org/.)

The purpose of this *Issues Brief* is to consider how information about grape characteristics and wine assessments affects wine prices. We present statistical analysis using data from the prices of 8,460 individual California wines.

## Technical approach – hedonic price analysis

The wine consumer faces complex choices. A bottle of wine embodies a bundle of characteristics that different consumers may identify and value differently. Hedonic (from the Greek word for pleasure) analysis relates the price of a good wine to its various quality or cost attributes. Statistical analysis helps to measure consumer valuations of the different wine attributes. Markets for attributes are implicit, but the implicit prices of the attributes determine the actual price of the wine.

Any variable that influences consumer benefit or producer cost is a candidate for inclusion in the hedonic price function. To obtain an estimation of these implicit prices, we use a statistical technique that relates the price of the wine to characteristics of the grapes, winery and wine.

## Data

The data used here consist of 8,460 observations on prices of five premium varietal wines (Cabernet Sauvignon, Chardonnay, Merlot, Pinot Noir, and Zinfandel) and 12 vintages (1989 to 2000) from all regions of California. The data were collected from the "New Releases for California" wines published in bimonthly issues of the *Wine Spectator* from January 15, 1995 to December 31, 2001. The data are spread evenly across the seven years of publication. For each observation, the magazine provides information

---

[1]Helene Bombrun was a post graduate researcher at the University of California Agricultural Issues Center; Daniel A. Sumner is the Frank H. Buck, Jr. Professor, Department of Agricultural and Resource Economics, University of California, Davis, and director, University of California Agricultural Issues Center.

## Table 1: Data description and statistics

| Variable to be explained | Weighted sample mean[1] |
|---|---|
| Price (in year 2001 dollars)[2] | 16.85 |
| Explanatory variables = Wine attributes | |
| Tasting score of the wine | 84.7 |
| Age of the wine at release (years) | 2.0 |
| Grape variety | |
| Cabernet Sauvignon | 28.8% |
| Chardonnay | 42.3% |
| Merlot | 17.4% |
| Pinot | 4.7% |
| Zinfandel | 6.8% |
| Grape location (from appellations)[3] | |
| North Coast region | 47.2% |
| (Napa County)[4] | 17.9% |
| (Sonoma County)[4] | 22.0% |
| Central Coast region | 15.5% |
| Sierra Foothills region | 0.5% |
| South and Central Valley | 1.7% |
| California, state appellation | 35.6% |
| Label designation | |
| Vineyard | 4.2% |
| Estate | 1.3% |
| Reserve | 12.8% |
| Grape vintage | |
| Vintages before 1993 | 3.8% |
| Vintage 1993 | 8.1% |
| Vintage 1994 | 13.3% |
| Vintage 1995 | 13.7% |
| Vintage 1996 | 15.1% |
| Vintage 1997 | 17.7% |
| Vintage 1998 | 16.5% |
| Vintage 1999 | 11.4% |
| Vintage 2000 | 0.4% |

[1] The means are weighted by the number of cases of each wine.
[2] The prices are reported in 2001 dollars using the CPI deflator.
[3] The sum of share for location variables is larger than 100% since some appellations contain two or more counties.
[4] These shares do not include Carneros appellation (6.5% of the observations), since it overlaps Napa and Sonoma counties.

contained on the wine label, the winery-recommended retail price per 750 ml bottle, the tasting score established by the *Wine Spectator* staff, and the number of cases produced. Moreover, the month and year of publication give an indication about the period of market availability of the wine, as well as its age at release. We note that the *Wine Spectator* mainly reviews relatively high-priced wines made from grapes grown in the coastal regions of California. Therefore, our data reflects only a small percentage of the California wines deriving from lower priced grapes grown in the Central Valley. Table 1 lists and summarizes means and standard deviations for some key variables.

The published price is a suggested retail price the wineries provide to the *Wine Spectator* at the time the wine is tasted and listed—which is also the time the wine is released on the market. Price, however, is susceptible to change over time. We may expect that higher published scores lead to higher actual retail market prices. In our sample, prices range from a minimum of $5 to a maximum of $325 per bottle, with a mean of $29.20 per bottle. The weighted mean price is $16.80 per bottle, reflecting higher prices for wines made in smaller quantities. Wine ratings reported in the *Wine Spectator* reflect how highly the editors regard each wine relative to other wines in its category.

Wines are tasted with labels covered. Tasters are told the general type of wine, variety, region, and vintage. (For details about how tastings are conducted, see *Wine Spectator*, Nov. 15, 2000, p.224.) In our sample, the wine quality index ranges from 68 to 99 with a mean of 86.9 and a weighted mean of 84.7.

Wines are released an average of two years after harvest. Almost 20 percent of the individual wines and 4.2 percent of the total wine quantity have a vineyard designation, which requires that at least 85 percent of the grapes used come from the designated vineyard. Only 2.4 percent of the wines and 1.3 percent of wine quantity contain the label designation "Estate." This designation requires that 100 percent of the fruit comes from the designated location and that winemaking takes place where the fruit was grown. About 14 percent of the wines and 12.8 percent of the wine quantity are "reserve wines," a term defined by the wineries with no regulations regarding its use.

The sample contains 126 grape appellations of origin. An appelation names the geographic origin of between 75 percent and 100 percent of the grapes used in the wine. About 79 percent of the wines and 46 percent of the wine quantity are also official American Viticultural Areas (AVAs) which are specific regions



Figure 1: Weighted average prices for different sub-samples

defined by wine regulators. Almost half of the total wines in the sample come from grapes grown in the North Coast, which represents almost three-quarters of the distinct wines and wine labels, including 18 percent from Napa County and 22 percent from Sonoma County. Most of the other wines designate essentially Central Coast grape appellations; very few refer to the South, the Central Valley or the Sierra regions. The general state appellation, "California," describes 5.8 percent of the labels, but more than one-third of the total wine.



Figure 1 shows that without controlling statistically for any other attributes, Cabernet wines are the highest priced wines in the state ($21.90 per bottle in weighted average), and Chardonnay wines are the lowest ($14.20). The figure also displays the average price of wines from four illustrative appellations among the 126 different designations for grape growing regions. Wines with the generic state appellation, "California," are the lowest priced ($9.80 in weighted average), while wines from Napa Valley reach a weighted average price of $29.60 per bottle. Oakville, at $45 per bottle, and Howell Mountain, at $43.60 per bottle, are the appellations with the highest average prices. Both are in the Napa Valley. Finally, Figure 1 also shows that the higher the tasting score, the higher the weighted average price. Moreover, the higher the score, the higher the price difference for one unit of score.

## Effect of Attributes on Price

The estimated hedonic price function is presented in Table 2. For continuous variables such as "score" and "age," the estimates represent implicit attribute prices. The results are presented as percentage impact of each variable on price. Conversely, for variables such as "Cabernet" or "Napa Valley," that take the value zero or one, the estimates measure the relative percentage impact (from the average price of the reference variable) of the attribute represented by the variable. The reference variables are "California" for the category "appellation"; "Merlot" for the category "variety"; and "1995" for the category "vintage." We also present the dollar values of the marginal effects associated with each of the explanatory variables. These values can be used to compare the magnitude of each characteristic of the reference variable for the corresponding category for all the other variables.

The variables (score, age at release, grape vintage, variety, appellation of origin) and the label designations (vineyard, estate, and reserve) explain 72 percent of the wine price variation when weighted by the number of cases made of each wine.

Let us consider the meaning of each of the estimates in Table 2. A one-point score increase in the *Wine Spectator* is worth almost 5 percent of the price or, on average, $0.83 per bottle. We expect that one unit difference in score in the top tasting rates will be worth more than $1 per bottle. The age of wine also matters. An additional year of storage before release is valued at $3.27 per bottle, on average. This benefit has to be compared to the cost of storing to determine if the additional year of storage is profitable. The specific "vineyard" designation has a higher impact on price than "reserve" designation. However, the strict "estate" designation does not have any significant impact on price.

Some characteristics of the grapes themselves have important direct impacts on wine prices, others do not. Grape varieties Chardonnay, Zinfandel and Cabernet (given other attributes constant) do not have significant impacts on wine prices (relative to Merlot wines). Pinot Noir however, has a price premium of 9.9 percent above Merlot prices. Similar regressions on variety subsamples do show some differences across varieties. Tasting score matters the most for Cabernet wines (which have a 7.6 percent premium per unit of score) and the least for Merlot wines (3.1 percent). This has to be compared to the marginal cost of improving quality for each variety in order to determine if growers and winemakers should attempt to increase the score of their Cabernet wines. Age at release matters most for Cabernet and Merlot, while age has a negative impact for Zinfandel wines. Vineyard designation is the most valuable for Pinot Noir wines and the least for Merlot and Zinfandel wines, while Zinfandel wines have by far the highest price premium for reserve wines (60.3 percent).

Region of origin and, particularly, appellation are also important to price. Only a few results are presented on Table 2. Out of 125 appellations included in the regression (California being the reference), more than half have a significant impact on prices. For example, Napa Valley, one of the most famous appellations in California, produces wines that are, on average, 61 percent more expensive than wines with a California

4

## Table 2: Selected partial effects of some key wine attributes on the price[1]

| Explanatory variables (or wine attributes) | Percentage Impact[2] | Dollar Impact[3] |
|---|---|---|
| Tasting score (1 point) | 4.9 | 0.83 |
| Age at release (years) | 19.4 | 3.27 |
| Label designation | | |
| Vineyard | 12.7 | 2.09 |
| Reserve | 5.9 | 0.99 |
| Grape variety (relative to Merlot) | | |
| Pinot Noir | 9.9 | 1.47 |
| Grape vintage (relative to 1995) | | |
| Vintage 1994 | -5.1 | -0.85 |
| Vintage 1996 | 8.9 | 1.49 |
| Vintage 1997 | 13.0 | 2.18 |
| Vintage 1998 | 12.2 | 2.04 |
| Vintage 1999 | 8.7 | 1.46 |
| Grape appellation (relative to "California")[4] | | |
| Selected appellations | | |
| Oakville | 90.6 | 8.91 |
| Sonoma Mountain | 84.9 | 8.36 |
| Napa Valley | 60.9 | 5.99 |
| Napa County | 31.2 | 3.07 |
| Paso Robles | 30.4 | 2.99 |
| Mendocino | 29.6 | 2.91 |
| Amador County | 28.3 | 2.78 |
| San Luis Obispo County | 27.4 | 2.70 |
| Sonoma County | 27.1 | 2.67 |
| Monterey | 22.3 | 2.19 |
| Central Coast | 19.0 | 1.87 |
| Lodi | 12.8 | 1.26 |

Number of observations:
8,460

[1] 2001 dollars using the Consumer Price Index.
[2] All variables are statistically significant at 95% confidence interval, Nonsignificant effects were for Estate, Cabernet Sauvignon, Chardonnay, Merlot, and Zinfandel.
[3] Calculated at sample mean for "score" and "age"; at sample mean of wines without the vineyard designation for "vineyard"; at the sample mean of wines without the reserve designation for the variable, "reserve"; and at the sample mean of wines with the attribute on price.
[4] A total of 125 appellations are included in the model and 64 appellations have a statistically significant effect relative to the "California" appellation.

appellation. This means that a bottle of Napa Valley wine, other characteristics constant, costs $6 more, on average, than a wine with a California appellation. Appellations with the highest premiums are mainly located within the Napa Valley appellation. For example, Oakville and Howell Mountain appellations earn a premium of 91 percent over wines with the California appellation.

Vintage is another key wine attribute directly related to grapes that has a significant impact on wine prices. Table 2 shows that the vintage 1997 has the highest price premium relative to vintage 1995. However, several effects have to be carefully considered. Year of release and age effect are closely (and linearly) related to vintage (harvest year). In Table 2, we controlled for the age at release and inflation effects. But this means vintage and age together imply a marketing period which is affected by aggregate grape and wine supply and demand factors. Further study should consider variables related to vintage or release date, such as the size of the total crush by location and variety, as well as the price of wine grapes. As price of grapes and price of wine are endogenous, a system of equations would have to be considered.

## Market implications

The estimated hedonic price function provides farmers, winemakers, marketers, and consumers with important marketing information.

The use of the average market price of a wine obtained from the estimated hedonic price function may help wine marketers review prices and position their wines in the market while allowing wine consumers to compare the actual and expected wine retail prices. To do so, consumers and marketers would need to identify all the attributes of their prospective sale or purchase, and sum the associated implicit prices in order to calculate the expected average price of the differentiated product.

For wine producers, the estimates provide important information for longer-term investment decisions. The comparison of benefits (estimated by the hedonic price function) and costs associated with the acquisition of each attribute must be evaluated in order to direct resources. For example, moving the production from California Merlot wines to Monterey Pinot Noir wines (everything else constant) leads to an increase in price of $3.70 per bottle. This benefit should be compared to the cost of producing and blending Monterey Pinot

Noir wines in order to determine whether an effort to achieve these new attributes is worthwhile.

These results measure how grape characteristics affect wine prices. Moreover, demand for wine determines, to a great extent, demand for grapes. Therefore, we would expect that a price premium for a certain wine variety or appellation would translate to a price premium for the corresponding wine grape variety and grape location. A comparison of results with a complementary study that relates grape prices with grape attributes, such as in Lee and Sumner (2001), would allow one to check the relationships between valuable attributes of grapes and the value of related attributes in wines.

## Conclusions

Most of the results presented here align with *a priori* expectations. Nevertheless, as far as we know, this is the first time such a thorough empirical study on California wine prices has been reported. We focused on how grape characteristics affect wine prices. Other studies using related data will focus on winery characteristics and related factors such as production size, advertising, and reputation.

## References

Lee H. and D. A. Sumner 2001. "Econometrics of grape prices in California: the roles of grape supply, location, variety, market power and contracted quality limits." Paper presented at the conference Enometrics VII, May 21-22, 2002, St. Helena, California.

Shanken, M., ed. 1995-2001. Wine Spectator: The Buying Guide – New Wines Around the World – California, bimonthly issues from Jan. 15, 1995 to Dec. 31, 2001.,. M. Shanken Communications, Inc., New York.

Sumner, D. A., H. Bombrun, J. Alston, and D. Heien. (In press.) "An economic survey of the wine and winegrape industry in the United States and Canada." In Globalization of the World's Wine Markets, Editor: K. Anderson. London: Edward Elgar, 2002.

Wine Institute. 2002 Federal Regulations, CFR 27, Part 4. www.wineinstitute.org, San Francisco: Wine Institute.

*AIC Issues Brief* is published by the University of California Agricultural Issues Center. Website: www.aic.ucdavis.edu

**EXHIBIT 13**



**Wine Business Monthly** - August 2004

## The 2004 American Wine Writer Survey

*By Tom Wark*

Consider the wine writing genre. Is there another single food or food-related product to which an entire genre of literature is devoted? What is it about wine that leads to so much interpretation? So many words. It isn't really that complicated when you back up and realize that for the most part, grapes are picked, juiced, fermented and bottled. But from this process has come an industry of some girth devoted to explaining the grape and the beverage it makes, as well as how and which one we should be drinking.

The wine writer in America is enormously influential. An outstanding review from certain writers or publications or a positive story about a winery in a national or regional newspaper can literally change the fortunes of wineries and people.

This survey and report on the American wine-writing community is meant to give a snapshot of the country's wine scribes as well as note the changes that have occurred since **Wark Communications** published its previous survey in 1995. Though the results that follow are not shocking, they are enlightening.

Between May 10 and May 20, 2004, 411 people were invited to participate in the survey. They were chosen for having written about wine at one time or another over the past six months. One hundred fifteen responded. This 28 percent rate of response is considered very good. It is twice the number of writers invited to take the 1995 survey and a 48 percent increase over the number of responses from 1995.

### The State of the Wine-Writing Genre

Is it reflective of a complex product--or an industry that makes its product overly complex--that the wine-writing genre in America is overwhelmingly devoted to education? For the most part, new wine books are devoted to teaching us how wine is made, what it should taste like and what foods wines should be served with.

A query of the **Amazon.com** books database shows 1,035 books with "wine" in the title published since 2000. The message one gets from scanning the titles is the extraordinary amount of help we need understanding wine.



The true wine lover gets their literary fix from wine magazines and newsletters, of which there are many. Five magazines have remained the most important American wine publications for the past decade: *Quarterly Review of Wines*, *Wine & Spirits*, *Wine Enthusiast*, *Wine News* and *Wine Spectator*. With the exception of *Quarterly Review of Wines*, which focuses on prose, all these publications have wine ratings at their heart. And, they all use the 100-Point rating system. These are important publications not only for consumers but also for the wine trade. With wine reviews and ratings such a critical element of wine marketing, these publications' opinions and ratings help define and create the market's quality and sales leaders. Yet it would be a mistake to define the magazines' importance by their ratings. Their articles also play an important part in helping the trade and sophisticated consumers understand the direction wine is taking.

Newsletters too are outstanding sources of detailed information. While most rate wine in one fashion or another, and while these ratings are also used by marketers to sell their wines, many newsletters also provide outstanding commentary. **Robert Parker's** *Wine Advocate*, *The California Grapevine*, *Connoisseurs' Guide to California Wine*, **Dan Berger's** *Vintage Experiences*, **Stephen Tanzer's** *International Wine Cellar*, *Colorado Wine News*, and **Ron Wiegand's** *Restaurant Wine* all fall into this category.

Rarely read by anyone other than industry people, but perhaps the most closely read wine material, comes from the industry's trade magazines. Among the most important trade publications are *Practical Winery and Vineyard*, *Vineyard & Winery Management*, *Wines & Vines*, *Wine Business Monthly*, *Wine Business Insider* and *Wine Market Report*.

The most convincing sign that wine is embedded in the American culture is the impressive number of newspapers that either have their own wine writer or subscribe to a syndicated wine column. This format is where Americans are most likely to be exposed to wine writing. And because the audience is less sophisticated, this is where the real wine education takes place.

The two most important weekly wine columns in America's daily papers are Frank Prial's *New York Times* wine column and the Dorothy Gaiter/John Brecher column in the *Wall Street Journal*. A recent development that can't be underestimated for its importance is the *San Francisco Chronicle*'s wine section--the first of its kind in America and a confirmation of the cultural mainstreaming of wine.

Finally, no review of the current state of the wine-writing genre would be complete without looking at wine information on the Internet. Nothing has changed the business of educating Americans on wine more than the emergence of this global communications network. Some of the best wine writing in the world appears on the Internet. Much of this writing has previously appeared in print. However, its new accessibility is what defines the impact of the Internet.

### Who are the American Wine Writers?

The answer to this question is fairly straightforward: They are male and over 50 years of age. Sixty percent of respondents to this survey identified themselves as over 50 years of age. But perhaps the most surprising, and unfortunate, finding was that no one identified themselves as being less than 30 years of age and writing about wine. In fact, only nine percent of respondents identified themselves as being 40 years old or younger.

American wine writers also tend to be men. In a near identical finding with the 1995 American Wine Writer Survey, only 24 percent of respondents to this year's survey identified themselves as female.

More than a third of respondents said they had been writing about wine for more than 20 years. A total of 60 percent of respondents said they had been writing on wine for more than 10 years compared with 40 percent who cited 10 years or less.

### How and Where American Wine Writers are Read

When asked to identify how often their writing appears, over 50 percent of respondents said either weekly or daily. This is an encouraging finding, suggesting that there is in fact regular demand for wine prose. But where is that demand coming from?

Generally that demand is coming from consumer media. Seventy percent of respondents identified either a local or national consumer audience as a typical target for their writing. One statistic to take note of is those who identified local consumers as their audience. While national writers tend to have more prestige and experience, the writer who caters to a local or regional audience provides a critical resource: those who can inform the public about what is happening in their own back yard.

Finally, when asked where their words usually appear, an overwhelming 95 percent of respondents said "in print." Twenty percent cited radio exposure and seven noted their exposure on television. But the huge difference that has come over the past 10 years is, again, the Internet. Sixty percent of respondents said their words appear on the Internet.

### How Wine Writers Prefer to Work

When asked how they would prefer to be contacted by marketers or publicists 83 percent of writers said "via email." Seventeen percent said by mail. However, what is most illuminating about these results is what they don't reveal: Survey takers were also given the opportunity to choose "by phone" as a method they prefer to be contacted by marketers and publicists. Not a single respondent said they would prefer to be contacted by phone.

Asked how they prefer to receive press releases, again 80 percent said via email and 20 percent, mail. When asked how many press releases they receive monthly, 43 percent of respondents said "50 or more." For the record, four percent said they received only 1-10 press releases a month, 30 percent said they received 10-25 press releases a month and 23 percent said the number was between 25 and 50 press releases per month.

How useful is the information sent to writers? The answer is not enough to make them think that anything more interesting would be learned if they talked to the release's writer rather than just receiving their e-mailed and mailed press releases. And this explains why zero percent said they want to be contacted via telephone.

Asked to describe the usefulness of most press releases, 36 percent of respondents said "rarely useful," 60 percent said "somewhat useful," and a pitiful five percent called these press releases "very useful."

Asked to describe the type of writing they do, 45 percent said "the business of wine" or "profiles of people, wineries and trends" best describe the type of writing they do.

**Press Samples:** It is a near immutable law of wine marketing that "if they can't taste it, they can't write about it." This is why we send press samples.

The business of deciding who gets press samples is complex and ultimately expensive for the winery. The cost of shipping alone can be very high. So, the idea is to carefully identify which writers should get samples and who wants to get samples. Wineries and marketers may not be doing a good job of this.

Most respondents (37 percent) reported receiving only 1-10 wine samples per month. Thirty-six percent of respondents receive 10-30 samples per month. Twenty-seven percent of respondents said they receive 30 samples or more. Eighteen percent receive more than 50 samples per month.

One would expect that those writers who tend to do primarily ratings and reviews of wines would receive far more wine samples. In fact, of those who identify themselves in this manner only 26 percent said they receive 50 or more samples per month and only five percent say they receive 30-50 wine samples per month. The "profile and trend" writers receive just as many samples as the reviewers.

The vast majority of respondents (67 percent) said they taste 80-100 percent of the samples they receive. A total of 10 percent of respondents admitted they only taste up to 40 percent of the samples they receive.

Finally, there is the question of how these press samples are reviewed and scored. While the 100-point scale seems omnipresent within the wine industry, this is only due to the fact that the most influential publications and reviewers utilize it. When asked what system was used to review or rate wines, 54 percent of respondents said "with a written description only." The 100-point rating system was cited by only 18 percent of the respondents while 12 percent said they used a rating system with no more than six categories.

### What Writers Read

It is difficult to draw any significant conclusions from the responses given to this question. However, it is noteworthy that the predominantly food-related publications such as *Gourmet*, *Bon Appetit* and *Food & Wine* score very high on the wine writer's radar. The *New York Times* wine column and *Wine Spectator* far outdistance other wine related selections, while the *San Francisco Chronicle* wine section, just a short time

in operation, seems to have the eye of the industry.

**What Wine Writers Think**

Asked to use their crystal ball to speculate upon which wine issues and topics are most likely to find their way into the general media over the next five years, a majority of respondents (53 percent) cited "pricing." Among the choices writers were given was "direct shipping." (It should be noted that this survey was undertaken before the announcement in May that the Supreme Court of the United States would take up the issue of direct shipping.) In this survey, 35 percent cited direct shipping as one of the issues most likely to catch the attention of the general media in the coming years. This percentage most certainly would have been higher had the survey been taken after the Supreme Court announcement.

**Bullish on Sales Trends:** The wine writing community is always among the first to witness new trends in marketing, pricing and sales. This gives them a particularly good vantage point in looking at future sales trends.

Asked to consider the sales trends in five pricing categories over the next two years, America's wine writers give some very specific and interesting responses. The most striking finding is that 82 percent believe there will be slight to significantly increased sales of $10-20-a-bottle wines over the next two years. Only two percent said this category would see any reduction in sales.

Forty-two percent believe that $5-$10-a-bottle wines would see "significantly increased sales" over the next 24 months. In fact, there was no price category offered to respondents in which a majority believed reduced sales would occur. Even with $40 a bottle or higher priced wines, only 29 percent of respondents predicted slightly or significantly decreased sales.

**Big, Unctuous, Massive-Good, Bad?** A far more complex issue, and one that is mainly debated within the wine trade, is the emergence of high-alcohol, highly extracted wines. They are controversial for a number of reasons. Writers were asked to choose a statement that best defines the emergence of the "big wine."

While a healthy percentage of writers (27 percent) chose to state that these wines "have their place in the market," a greater number of writers chose to define them as existing mainly due to the importance of rating systems and wine competitions. It is unclear whether this is an unfortunate thing. However, the 31 percent of writers who said these wines either have "led to a degradation in the quality of California wines" or "exemplify a move toward style over *terroir* in America," presumably believe the big, unctuous, massive wines are not such a good thing.

Drawing practical conclusions from the American Wine Writer Survey are not difficult. Most obvious is that there are a relatively large number of writers in America looking for something compelling to give their readers. For wineries and wine marketers, the key is to give them what they want. And their wants and desires can be fairly specific. Knowing this makes the marketers' and publicists' job easier, as well as the writer's. **wbm**

**Tom Wark** is a partner at Wark Communications, a wine-oriented public relations and design firm located in Glen Ellen, California. Wark has worked with numerous domestic and international wineries for 15 years, lectured on wine public relations, and written articles on wine. Tom can be reached at 707-933-9313 or at tom@warkcommunications.com.

Copyright© 1994-2008 by Wine Communications Group, Inc. All Rights Reserved. Copyright protection extends to all written material, graphics, backgrounds and layouts. None of this material may be reproduced for any reason without written permission of the Publisher. Wine Business Insider, Wine Business Monthly, Grower & Cellar News and Wine Market News are all trademarks of Wine Communications Group, Inc and will be protected to the fullest extent of the law.